J. S20016/17

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF:  R.N.R., | : | IN THE SUPERIOR COURT OF |
| A MINOR | : | PENNSYLVANIA |
| | : | |
| APPEAL OF:  A.R., FATHER | : | No. 3305 EDA 2016 |

Appeal from the Decree, September 29, 2016,
in the Court of Common Pleas of Philadelphia County
Family Court Division at Nos. CP-51-AP-0000835-2016,
CP-51-DP-0001108-2015

BEFORE:  BOWES, J., OTT, J. AND FORD ELLIOTT, P.J.E.

MEMORANDUM BY FORD ELLIOTT, P.J.E.:          **FILED APRIL 19, 2017**

A.R. ("Father") appeals from the decree entered September 29, 2016, in the Philadelphia County Court of Common Pleas, granting the petition of the Philadelphia County Department of Human Services ("DHS") and involuntarily terminating his parental rights to his minor, dependent son, R.N.R. ("Child"), born in November of 2012, pursuant to the Adoption Act, 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b).[1]  Father further appeals the order entered September 29, 2016, changing Child's permanency goal to

---

[1] By separate decree entered the same date, the trial court also involuntarily terminated the parental rights of Child's mother, B.N. ("Mother"), also pursuant to Section 2511(a)(1), (2), (5), (8), and (b).  Mother did not appeal, nor is she a party to the instant appeal.

adoption pursuant to the Juvenile Act, 42 Pa.C.S.A. § 6351.[2]  After review,

we affirm.

The trial court summarized the relevant procedural and factual history,

in part, as follows:

> The family in this case has been known to DHS since March 17, 2015, when DHS received a report that Child had been taken to a hospital by Father. Father alleged that B.N. ("Mother") abused and neglected Child.  Father threatened to physically harm hospital staff if they did not treat Child.  On March 19, DHS visited Father in the home of J.F., Child's paternal grandmother ("Grandmother").  The home was appropriate, and Grandmother told DHS that she supported Father and Child.  On April 14, 2015, Grandmother informed DHS that she had evicted Father and Child after Father had threatened her.  DHS met with Father in a temporary residence, but he was unable to obtain stable housing through other services because he had been banned for threatening employees there.  On May 14, 2015, the trial court adjudicated Child dependent, fully committed him to DHS custody and placed him in foster care.  The case was then transferred to a Community Umbrella Agency ("CUA") which developed a Single Case Plan ("SCP") with objectives

---

[2]  Father failed include any claim relating to the change of Child's permanency goal in the statement of questions involved section of his brief, and failed to develop any argument related to this issue in his brief.  Any challenge to this issue is therefore waived.  **See Krebs v. United Refining Co. of Pennsylvania**, 893 A.2d 776, 797 (Pa. Super. 2006) (stating that, a failure to preserve issues by raising them both in the concise statement of errors complained of on appeal and statement of questions involved portion of the brief on appeal results in a waiver of those issues); **In re W.H.**, 25 A.3d 330, 339 n.3 (Pa. Super. 2011), **appeal denied**, 24 A.3d 364 (Pa. 2011), quoting **In re A.C.**, 991 A.2d 884, 897 (Pa. Super. 2010) ("'[W]here an appellate brief fails to provide any discussion of a claim with citation to relevant authority or fails to develop the issue in any other meaningful fashion capable of review, that claim is waived.'").

for Father. Over the course of 2015 and 2016, Father did not complete his objectives. . . .[3]

Trial court opinion, 11/10/16 at 1.

The trial court held regular permanency review hearings in this matter. Throughout these reviews, the trial court maintained Child's commitment and placement and permanency goal.

DHS filed petitions to terminate parental rights and for a goal change on September 13, 2016. The trial court held a combined termination/goal change hearing on September 29, 2016. In support thereof, DHS and the Child Advocate presented the testimony of the following: Andrea Freeman, CUA, NET, aftercare worker, former case manager; Nashanta Robinson, CUA, NET, case manager; Calea Moore, CUA, NET, case aid. In addition, there was an agreement to stipulate that CUA would testify as to the facts in the petition. (Notes of testimony, 9/29/16 at 8.) DHS also offered Exhibits DHS 1-5, and the Child Advocate offered Exhibits CA 1-5, which were all admitted without objection. (*Id.* at 6-7, 12-13.) Father additionally testified on his own behalf. By decree entered September 29, 2016, the trial

---

[3] Father's objectives included compliance with Northeast Treatment Centers ("NET") services; enrollment in Achieving Reunification Center ("ARC") for employment and drug and alcohol therapy; attendance at the Clinical Evaluation Unit ("CEU"); attendance at Behavioral Health Services ("BHS"); housing; visitation; completion of a parenting capacity evaluation; signature of consent forms; participation in a dual-diagnosis program; and provision of proof of employment and income. (Notes of testimony, 9/29/16 at 26.) Testimony was also presented as to referrals for parenting, anger management, and domestic violence. *Id.* at 29.

court involuntarily terminated the parental rights of Father pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b). On August 25, 2016, Father, through appointed counsel, filed a timely notice of appeal, along with a concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).

On appeal, Father raises the following issue for our review:

> Whether the trial court terminated the Father's parental rights in the absence of clear and convincing evidence that termination served the needs and welfare of the child?

Father's brief at 2.

In matters involving involuntary termination of parental rights, our standard of review is as follows:

> The standard of review in termination of parental rights cases requires appellate courts "to accept the findings of fact and credibility determinations of the trial court if they are supported by the record." *In re Adoption of S.P.*, 47 A.3d 817, 826 (Pa. 2012). "If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion." *Id.* "[A] decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." *Id.* The trial court's decision, however, should not be reversed merely because the record would support a different result. *Id.* at 827. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings. *See In re R.J.T.*, 9 A.3d [1179, 1190 (Pa. 2010)].

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013). "The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence." *In re M.G.*, 855 A.2d 68, 73-74 (Pa.Super. 2004) (citation omitted). "[I]f competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result." *In re Adoption of T.B.B.,* 835 A.2d 387, 394 (Pa.Super. 2003) (citation omitted).

Section 2511 of the Adoption Act, 23 Pa.C.S.A. §§ 2101-2938, controls the termination of parental rights, and requires a bifurcated analysis, as follows:

> Our case law has made clear that under Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa.Super. 2007) (citations omitted). We have defined clear and convincing evidence as that which is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear

conviction, without hesitance, of the truth of the precise facts in issue."
***In re C.S.***, 761 A.2d 1197, 1201 (Pa.Super. 2000) (***en banc***), quoting
***Matter of Adoption of Charles E.D.M. II***, 708 A.2d 88, 91 (Pa. 1998).

In this case, the trial court terminated Father's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), and (8), as well as (b). We have long held that, in order to affirm a termination of parental rights, we need only agree with the trial court as to any one subsection of Section 2511(a), well as Section 2511(b). ***See In re B.L.W.***, 843 A.2d 380, 384 (Pa.Super. 2004) (***en banc***). Here, Father does not challenge the trial court's finding of grounds for termination under Section 2511(a). We, therefore, analyze the court's termination pursuant to Section 2511(b) only, which provides as follows:

> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(b).

With regard to Section 2511(b), our supreme court has stated as follows:

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." *In re K.M.*, 53 A.3d 781, 791 (Pa.Super. 2012). In *In re E.M.*, 620 A.2d [481, 485 (Pa. 1993)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. *In re K.M.*, 53 A.3d at 791. However, as discussed below, evaluation of a child's bonds is not always an easy task.

*In re T.S.M.*, 71 A.3d at 267. "[I]n cases where there is no evidence of a bond between a parent and child, it is reasonable to infer that no bond exists. Accordingly, the extent of the bond-effect analysis necessarily depends on the circumstances of the particular case." *In re Adoption of J.M.*, 991 A.2d 321, 324 (Pa.Super. 2010) (citations omitted).

When evaluating a parental bond, "the court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, Section 2511(b) does not require a formal bonding evaluation." *In re Z.P.*, 994 A.2d 1108, 1121 (Pa.Super. 2010), citing *In re K.K.R.-S.*, 958 A.2d 529, 533 (Pa.Super. 2008) (internal citations omitted).

Moreover,

> While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.
>
>> [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. . . .

*In re Adoption of C.D.R.*, 111 A.3d 1212, 1219 (Pa.Super. 2015), quoting *In re N.A.M.*, 33 A.3d 95, 103 (Pa.Super. 2011) (quotation marks and citations omitted).

Instantly, in examining Section 2511(b) and determining whether termination of Father's parental rights serves Child's needs and welfare, the trial court reasoned as follows:

> Father misses half his scheduled visits with Child. He claims he oversleeps. Father does not use the visits to build a relationship with Child. He does not interact with Child, but argues with and threatens CUA employees. Father is hostile and threatening to everyone he interacts with. His visits had to be moved to DHS because he fought with CUA. He fought with parents during visits. Father demonstrated no interest in reunification with Child. His main concern was ensuring Child was placed with one of his family members. Child is not bonded with Father, and calls Father by his first name only. When Father testified about his relationship with Child, the only positive example he could provide of their relationship was that Father had once bought Child expensive sneakers. Child would not suffer

irreparable harm if Father's rights were terminated. Child is placed in a pre-adoptive foster home, and calls his foster mother "Mom." He is very happy there and responds well to the foster mother. The foster mother takes Child to events with her family, and meets all of Child's daily needs. The foster mother has made extraordinary efforts to provide Child a safe and stable home, choosing to give up other foster children in order to keep him. It is in Child's best interest to terminate Father's parental rights. Consequently, the court did not abuse its discretion when it found that it was clearly and convincingly established that there was no positive, beneficial parent-child bond with Father, and that termination of Father's parental rights would not destroy an existing beneficial relationship.

Trial court opinion, 11/10/16 at 10-11 (citations to record omitted).

Father, however, argues that expert testimony was not offered regarding the bond between him and Child or the effect of the termination of his parental rights. (Father's brief at 11.) Rather, only the testimony of one social worker, who had not recently observed visits between Father and Child, was presented. (*Id.*) Highlighting his own testimony, Father asserts that he, in fact, had a "close and caring" relationship with Child. (*Id.*) In further support of this, Father notes that the court took judicial notice that Child called Father "Dad" at recent visits. (*Id.* at 12.) Hence, Father maintains that "the trial court's conclusion that that [sic] no positive beneficial bond existed between Father and Child, and that terminating Father's parental rights would not be detrimental to Child is not supported by the evidence." (*Id.* at 13.) We disagree.

Upon review, the record supports the trial court's finding that Child's needs and welfare favor termination of Father's parental rights. Initially, we observe that Father's compliance with his established objectives was reported as "minimal" or "none." (Notes of testimony, 9/29/16 at 41, 83.) Further, former CUA case manager, Andrea Freeman, indicated that Father did not appear interested in reunification. (*Id.* at 41.) Rather, "his main concern was his son being taken in by a family member." (*Id.* at 42.) Likewise, the current CUA case manager at the time of the hearing, Nashanta Robinson, confirmed that Father indicated that, if Child were reunified with him, Child would be with his mother. (*Id.* at 82-82.)

Additionally, Father's visitation with Child remained supervised and was changed from occurring at CUA to DHS with male supervision due to an altercation between Father and the case aid and another parent. (*Id.* at 34, 101-102.) The CUA case aid who supervised Father's visits with Child while still at CUA, Calea Moore, noted two instances where Father exhibited threatening behavior at visitation. (*Id.* at 101-02.) Ms. Moore also observed that Father was "aggressive" and "disrespectful" toward female caseworkers. (*Id.* at 102.) Ms. Freeman recounted that Father's visits were not consistent, at one point 50 percent, noting he would oversleep or

forget.[4] (***Id.*** at 34-35.) Similarly, Ms. Robinson stated that Father missed 4 of 14 visits since the last hearing.[5] (***Id.*** at 80.) As to the interaction between Father and Child during the visits, Ms. Moore observed that there was not a lot of interaction between Father and Child. (***Id.*** at 103.) Ms. Moore stated that Father was instead distracted, contacting case managers or talking to other parents. (***Id.*** at 102-103.) Father did not offer redirection or even acknowledge redirection was required. (***Id.*** at 104.) In describing the visits, Father offered, "[W]e basically play, and I buy him stuff." (***Id.*** at 110.) All of the CUA workers testified that Child called Father by his first name. (***Id.*** at 54-55, 86-87, 103.)

Moreover, and significantly, Child is in a pre-adoptive home. (***Id.*** at 43.) Child "responds well" to his foster mother, whom he calls "Mom." (***Id.*** at 43, 53.) Ms. Freeman characterized the relationship as consisting of a mother-child bond. (***Id.*** at 44.) In addition, as reported by Ms. Freeman, Child's foster mother is "fully able to meet all of [Child's] needs." (***Id.*** at 54.) Ms. Robinson further corroborated the positive nature of the relationship, noting how Child's foster mother provides redirection as well as educational stimulation. (***Id.*** at 84.)

---

[4] Ms. Freeman confirmed confrontational behavior, including inappropriate text messages, on the part of Father toward herself as well as other CUA caseworkers. (***Id.*** at 52. ***See also*** Exhibit CA-4.) Father claimed these were not his text messages and suggested that a text-free application was used to insert his information. (***Id.*** at 109-110.)

[5] Father blamed missing these visits on Ms. Robinson. (***Id.*** at 114-115.)

As such, Ms. Freeman changed the Child's goal to adoption and, referencing the lack of a father-son bond, opined there would be no irreparable harm if Father's parental rights were terminated. (*Id.* at 42, 44-45.) Likewise, Ms. Robinson confirmed Child's goal was still adoption and suggested adoption would be in Child's best interest. (*Id.* at 84.) Thus, we conclude that the trial court did not abuse its discretion in finding termination of Father's parental rights serves Child's needs and welfare pursuant to Section 2511(b).

Accordingly, we affirm the decree of the trial court involuntarily terminating Father's parental rights and order changing Child's permanency goal to adoption.

Decree affirmed. Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 4/19/2017